## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| GRIZZLY TOURING, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>RODARIUS MARCELL GREEN (a/k/a ROD WAVE), and HIT HOUSE ENTER-TAINMENT, INC.<br><br>Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**Preliminary and Permanent Injunctive Relief Requested** |

Plaintiff Grizzly Touring, LLC ("Grizzly") hereby alleges, by and through its undersigned counsel, as follows:

### PRELIMINARY STATEMENT

1.    Grizzly brings this lawsuit to recover approximately $27 million in unearned and unrecouped advances made to Defendant Rodarius Marcell Green a/k/a Rod Wave ("Artist") and his company, Defendant Hit House Entertainment, Inc. ("Hit House"), and to obtain damages and other relief for harm caused by Artist's refusal to honor his contractual obligations.

2.    Grizzy, a promoter of large-scale live events for hip-hop and other musical artists, agreed to promote Artist's *Last Lap* Tour pursuant to the Amendment to North American Tour Offer dated February 1, 2024 (the "Amended Tour

Agreement," attached hereto as Exhibit 1). Under the Amended Tour Agreement, Grizzly agreed to guarantee Artist a total payment of $40,250,000 (the "Guarantee") to perform 35 shows (the "Shows"), inclusive of Artist travel, lodging, hospitality, show catering, production, cancellation insurance, support, and support production and backline costs, all of which were Artist's responsibility. Ex. 1 § 7. To help Artist pay those costs, Grizzly agreed to advance *half* of the Guarantee—$20,125,000—to Artist upfront. *See id.* § 8(a)-(b). In exchange, Artist agreed to perform the Shows and to not perform any other live concerts or announce or advertise any other performances until after the Shows were completed (subject to certain exceptions not relevant here).

3.    Grizzly has at all times sought to be a helpful and supportive business partner and has gone above and beyond its contractual obligations to help Artist grow his career. The Amended Tour Agreement was itself a concession. Artist had already agreed to perform the Shows under the parties' original two-leg tour agreement. However, after using its experience and expertise to help Artist achieve unprecedented success in his *Nostalgia* tour in 2023, Grizzly agreed to amend the parties' original agreement—and give Artist a significantly better deal—for the *Last Lap* tour.

4.    Grizzly also reluctantly agreed to advance even more funds, in the tens of millions of dollars, to cover expenses like production costs that were Artist's obligation under the Amended Tour Agreement, even though those expenses were supposed to be paid for by the more than $20-million that Grizzly advanced to Artist before the *Last Lap* tour.

5.    All in all, Grizzly has advanced *over $57 million* either directly to Defendants or to pay expenses on Defendants' behalf.

6.    Artist, on the other hand, has refused to honor his obligations under the Amended Tour Agreement. Artist has only performed twenty-six Shows since the *Last Lap* tour began in October 2024. That means Artist has only earned $29,900,000 against the Guarantee, pursuant to its terms, and, as a result, now owes Grizzly over $27 million for the amounts Grizzly advanced and paid on Artist's behalf. Artist also personally guaranteed these obligations pursuant to the Artist Guaranty of Performance dated February 1, 2024 (the "Artist Guaranty," attached hereto as Exhibit 2).

7.    Artist refuses to pay Grizzly a single penny of the more than $27 million he owes, and was required to pay in the first instance, and has instead chosen to spend his advance on private jets and lavish second homes.

8.    Adding insult to injury, Artist also has publicly announced that he plans to launch a new tour through his own touring company, in direct violation of his exclusivity obligations under the Amended Tour Agreement. And Artist has made unfortunate statements about Grizzly, falsely claiming that some of the Shows during the *Last Lap* tour were cancelled or rescheduled as a result of poor scheduling and routing by Grizzly, which is simply not true, and belied by the fact that Defendants knew and signed off on the schedule and route months in advance. The Shows were cancelled because of production issues, which were the responsibility of Artist and Hit House alone. Indeed, the schedule and tour route were ***approved by Artist and his team***, and it was not until the first Show that Artist's team informed Grizzly that they might not be able to take down and set up the Shows as quickly as they had originally planned, in light of the increased scale of the production that Artist desired for the *Last Lap* tour. Grizzly, for its part, did nothing but help Artist navigate these issues, including by coordinating with the arenas to reschedule the Shows, which was no easy task given other competing events of these venues that occupy the same arenas in which Artist sought to play.

9.    Despite Grizzly's good faith efforts to resolve these issues amicably, Artist refuses to honor his responsibilities. Grizzly therefore had no choice but to

bring this lawsuit to recover the more than $27 million in unearned, unrecouped advances that Grizzly made to Defendants and other damages, including lost profits for unperformed Shows, that Grizzly has suffered as a result of Defendants' breaches, and to enjoin further breach of its exclusivity rights.

## **GENERAL ALLEGATIONS**

## I.    **Parties, Jurisdiction, and Venue**

10.    Grizzly is a Delaware limited liability company with its principal place of business in Kansas. Grizzly has two members: (i) Sabertooth Touring LLC ("Sabertooth"); and (ii) AG Entertainment Touring, LLC ("AG Entertainment"). Sabertooth is a Delaware limited liability company with its principal place of business in Kansas. Sabertooth has two members: (a) Mammoth Inc. ("Mammoth") and (b) Eventim Live USA, Inc. ("Eventim"). Mammoth is a Kansas corporation with its principal place of business in Kansas. Eventim is a Delaware corporation with its principal place of business in New York. AG Entertainment is a Georgia limited liability company with its principal place of business in Atlanta, GA. AG Entertainment's sole member is James Crawford, who is a resident of Georgia.

11.    Artist is a resident of St. Petersburg, Florida.

12.    Hit House is a Florida corporation with its principal place of business in St. Petersburg, Florida.

13.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff is not a resident of the same state as any Defendant.

14.     Venue is proper in the Middle District of Florida as at least one Defendant resides in this district.

15.     This Court has personal jurisdiction over (a) Hit House because it is incorporated in Florida, and (b) Artist because he is a resident of Florida and submitted to the personal jurisdiction of this Court in the Artist Guaranty.

## II.    **The Parties**

16.     Grizzy is a joint venture that promotes large-scale arena concerts for hip hop and other artists.

17.     Artist is an American rapper, singer, and songwriter who is known for his strong voice and incorporation of hip hop and R&B, and who has been recognized as a pioneer of "trap-soul." Artist broke out in the music industry in 2019, when he released his single "Heart on Ice," which went viral on TikTok and peaked at number 25 on the Billboard Hot 100, before releasing his debut studio album, *Ghetto Gospel*, which peaked at number ten on the US Billboard 200. His second album, *Pray 4 Love*, peaked at number two on the chart and included the song "Rags2Riches" (remixed featuring Lil Baby), which peaked at number 12 on the Billboard Hot 100. His next three albums—*SoulFly*, *Beautiful*

6

*Mind*, and *Nostalgia*—each debuted atop the Billboard 200 and received platinum certifications by the Recording Industry Association of America. Artist matched Taylor Swift as the only musical artist to release a new chart-topping solo album in three consecutive years. In 2024, Artist released his sixth studio album, *Last Lap*, which debuted at number two on the Billboard 200, making him the only male artist to release a top ten album each year from 2019 to 2024. Artist ranks among the highest certified artists in the United States, with 65 million digital copies sold nationwide.

## III.  The Original Tour Agreement, Amended Tour Agreement, and Artist Guaranty

18.    AG Entertainment, a member of Grizzly, promoted Artist's *Beautiful Mind* tour in 2022 to great success. Recognizing that Artist was drawing larger crowds and rapidly gaining popularity and acclaim, AG Entertainment brought Artist to Grizzly.

19.    Grizzly, Artist and Hit House originally entered into the North American Tour Agreement dated February 8, 2023 (the "Original Tour Agreement," attached hereto as Exhibit 3), which contemplated two tour legs. Specifically, Artist agreed to perform seventy shows in North America, split into two legs of 35 shows each. Ex. 3 §§ 4, 5, 6. Grizzly agreed to pay Artist a guarantee of $53

million, "inclusive of Support, Artist supplied Sound & Lights, and Artist travel & lodging," for both legs. *Id.* § 7.

20.    Grizzly also agreed to pay Hit House "an advance against the Guarantee as follows:

   a. $20,000,000 at execution of Tour Agreement, including promoter provided cancellation insurance and artist personal guaranty.
   b. $5,000,000 from Artists Balance due in Leg 1 will be allocated for use at Artist's sole discretion on tour expenses such as but not limited to production, catering, support, tax withholding, travel, hospitality, etc.
   c. $10,000,000 upon announce (sic) of 2nd Leg of tour
   d. $5,000,000 after the first show of the 2nd Leg
   e. #13,000,000 balance due for 2nd Leg of tour will be prorated over the remaining 34 show dates at $382,352.94 per date."

*Id.* § 8.

21.    The Original Tour Agreement also contains an exclusivity clause, providing that "Artist will not perform live concerts . . . nor allow the announcement or advertising of any Artist performances other than Shows in the Territory throughout the Term, unless agreed upon by [Grizzly] in writing . . . ." *Id.* § 10.

22.    Artist performed the first of the two tour legs (i.e., the *Nostalgia* tour) in 2023. The parties enjoyed unprecedented success from the *Nostalgia* tour.

23.    For the second tour leg, Artist wanted to increase the size and scope of the production for his shows, including by performing on a 360-degree stage

rather than at 180-degree venues. Artist also wanted to earn a higher per-show fee.

24.    Grizzly and Artist thus agreed to amend the terms of the second tour leg (i.e., the *Last Lap* tour) pursuant to the terms of the Amended Tour Agreement. *See generally* Ex. 1 at 1.

25.    The Guarantee in the Amended Tour Agreement was $40,250,000, which would be "earned at a rate of $1,150,000 per show." *Id.* § 7.

26.    The Amended Tour Agreement stated that the "Guarantee is inclusive of Artist travel, lodging, hospitality, show catering, production, cancellation insurance, support, and support production/backline." *Id.* § 7(a).

27.    Grizzly agreed to pay Hit House a $20,125,000 advance, subject to Artist's execution of the Artist Guaranty, within 5 business days of the execution of the Amended Tour Agreement. *Id.* § 8(a)-(b). The balance of the Guarantee was to be paid pro-rata on a weekly basis via bank wire. *Id.* § 8(c).

28.    The Amended Tour Agreement also contains an exclusivity clause, providing that "Artist will not perform live concerts, including festivals and sell-offs, nor allow the announcement or advertising of any Artist performances other than Shows in the Territory throughout the Term, unless agreed upon by Promoter in writing, with the exception of private shows (not announced or advertised to

the public), TV appearances (not to exceed 3 songs), radio shows and charity events (provided the foregoing do not materially interfere with Shows)." *Id.* § 10. The "Term" is defined in the Amended Tour Agreement as "[c]ompletion of all Show dates (mutually agreeable dates)." *Id.* § 5. The Amended Tour Agreement further provides that "Artist agrees that Promoter will have Right of First Refusal on all show dates globally while this agreement is in effect." *Id.* § 10.

29.    Artist and Grizzly also executed the Artist Guaranty simultaneously with the Amended Tour Agreement. *See generally* Ex. 2.

30.    In the Artist Guaranty, Artist provided a personal guarantee of "all obligations of [Hit House]/Artist under the [Amended] Tour Agreement, including but not limited to Company/Artist's obligation to return any unearned portions of the Advance(s) that becomes due and owing under the [Amended] Tour Agreement." *Id.* §§ 1, 3.

31.    The Artist Guaranty contains a jury trial waiver. *Id.* §12.

32.    The Artist Guaranty also includes a clause providing that Artist "consents to the exercise of personal jurisdiction over [Artist] by any federal or local court in the United States District Court for the Middle District of Florida . . . ." *Id.* § 13.

33.    The Artist Guaranty notes that it "shall be governed, and construed in accordance with, the laws of the State of Florida. *Id.* § 17.

34.    Finally, the Artist Guaranty provides that "[a]ll attorneys' fees and expenses of whatsoever nature which [Grizzly] incurs in connection with the enforcement of the performance of any Guarantor's obligations under this Guaranty shall be payable by Guarantor to [Grizzly] and such obligation on the part of Guarantor shall be joint and several." *Id.* § 5.

## IV.    Artist Abandons the *Last Lap* Tour and Launches His Own Touring Company

35.    After the Amended Tour Agreement was executed, Artist and Hit House demanded that Grizzly advance additional funds to cover the upfront costs of production, support, and othercosts for which Artist and Hit House are responsible under the Amended Tour Agreement. Grizzly reluctantly agreed.

36.    The *Last Lap* tour was announced on or around September 4, 2024. The tour was originally scheduled to begin on October 19, 2024 and conclude on December 18, 2024.

37.    Grizzly worked with Artist, Hit House, and venue operators to schedule and route all Shows based on the parameters set by Artist and Hit House.

38.    Artist and Hit House approved all dates, schedules and routes for the *Last Lap* tour before it was announced.

11

39.     Following the first Show, Artist and Hit House advised Grizzly that it would be extremely difficult for Artist to perform Shows back-to-back (i.e., on consecutive days) due to the amount of time required to set up and take down production, which was significantly larger and more extensive than the production for the *Nostalgia* tour.

40.     As a result the production issues, a number of the Shows had to be cancelled and/or rescheduled, which required the tour to be extended into 2025, beyond the originally scheduled completion date.

41.     Also as a result of the production issues, production costs increased significantly because production expenses are calculated based on the amount of time needed to lease equipment, rather than the number of Shows performed.

42.     Moreover, as a result of the production issues, Grizzly had to go back to venue operators to reschedule the Shows after having already paid deposits for the originally scheduled dates.

43.     Grizzly also agreed to promote an additional five Shows under the Amended Tour Agreement so that Artist could earn additional funds to repay Grizzly.

44.     As of the date of this Complaint, Artist has completed only twenty-six Shows.

45.    Because Artist has only performed twenty-six shows, he has earned $29,900,000.00 under the Amended Tour Agreement.

46.    Further, while it was originally contemplated that Artist would use the $20,125,000 advance to pay for items like "production, cancelation insurance, support, and support production/backline," Grizzly agreed, at Artist's request, to advance those costs on Artist's behalf too.

47.    In total, Grizzly has advanced $57,143,146.86 to Artist, including: the $20,125,000.00 advance; $5,655,000.00 in support costs; $553,199.00 in out-standing support; $947,504.05 in insurance costs; $1,741,658.00 in cancellation costs; $19,491,834.94 in production payouts; $406,960.80 in Artist chargebacks; $356,500.00 in withholding tax; $3,058,800.00 in cash received; $1,956,690.07 as a carryover deposit from 2023, and a $2,850,000.00 advance from AG Entertainment. Grizzly advanced all of these funds without interest.

48.    Accordingly, the amount owed by Defendants under the Amended Tour Agreement and by Artist under the Artist Guaranty is $27,243,146.86 ($57,143,146.86 - $29,900,000.00). Grizzly also has suffered lost profits and other damages as a result of Artist's failure to perform all of the Shows.

49.    In a September 8, 2025 interview published by Billboard (attached hereto as Exhibit 4), Artist claimed he could not perform all Shows due to alleged

issues with production and routing (i.e., coordinating the path of the tour to min-imize travel time and expense). *See* Ex. 4.

50.    However, Artist and Hit House were responsible for production un-der the Amended Tour Agreement. Moreover, the schedule and routing were set based on the parameters provided by Artist and Hit House, and both Artist and Hit House specifically approved the schedule and route for the tour before it was publicly announced.

51.    Rather than fulfil his contractual obligation to perform all of the Shows, Artist has announced the launch of his own touring company, "Mainstay Touring." Ex. 4. Artist publicly announced that he, through Mainstay Touring, plans to announce more tour dates in December 2025, in connection with the re-lease of Artist's new album, which is expected to be released in October or No-vember. *Id.* According to Artist, "I'm just taking over my touring business." *Id.* Artist stated that he is "[l]ooking forward to launching the rest of the tour." *Id.*

52.    Upon information and belief, in or around September 2025, Artist's agency, Major Artist Concerts Agency ("MAC Agency") reached out to at least one venue, stating that Artist was touring as a "self promote" and is no longer working with any other promoter companies, and inquiring about the venue's availability for November 2025 through March 2026.

53.    Upon information and belief, Artist intends and has made or is making plans to launch a new tour without Grizzly beginning in as early as late 2025.

## V.    Artist Refuses to Comply with the Amended Tour Agreement and Artist Guaranty

54.    Grizzly sent several letters to Artist and Hit House in May, June, and July of 2025, informing them of Artist's failure to finish the second leg of the Tour and requesting payment of the outstanding advances Artist owes to Grizzly.

55.    Defendants did not respond until September 18, 2025, when Grizzly received a letter from Defendants' counsel, a copy of which is attached hereto as Exhibit 5 ("Response Letter").

56.    In the Response Letter, Artist's counsel unequivocally refuses to repay Grizzly any of the $27 million owed. *Id.* at 1.

57.    The letter further stated that Artist will not be abiding by the exclusivity clause of the Amended Tour Agreement. *Id.*

58.    The Response Letter also claimed that any failure by Artist to perform the remaining Shows would only reduce pro-rata the guarantee for those particular performances, and there would be nothing for Artist to return. *Id.*

59.    The Response Letter overlooks that Grizzly advanced Artist over $57 million (*see supra* ¶ 47), including for production costs, insurance, and other items that Artist was responsible for under the Amended Tour Agreement, and

that Artist guaranteed in the Artist Guaranty. Ex. 1 § 7(a) ("Guarantee is inclusive of Artist travel, lodging, hospitality, show catering, production, cancelation insurance, support, and support production/backline."); Ex. 2 § 1 (defining "Obligations" that Artist is required to guarantee, to include "unearned portions of the Advance(s) that becomes due and owing under the [Amended] Tour Agreement"). It also overlooks that Grizzly lost profits on the remaining Shows that Artist did not perform.

60.    Artist must reimburse Grizzly for those advanced payments and pay Grizzly for its lost profits as a result of his breach.

61.    The Response Letter also claims that the Amended Tour Agreement is no longer in force and effect due to Grizzly's purported breaches of the Amended Tour Agreement. Ex. 5 at 2. Particularly, the Response Letter states that Grizzly made "unilateral, onerous and inexplicable routing and booking decisions - often at the last minute . . . ." *Id.*

62.    Those accusations are simply untrue. In fact, Artist's representatives approved all of the Show dates, as well as the routing and booking decisions, well in advance of the originally scheduled Shows.

63.    Finally, the Response Letter claims that Grizzly "failed to properly ship and load-in [Artists] touring equipment and staging, a fundamental obligation and basic expectation under the Agreement . . . ." Ex. 5 at 2.

64.    However, Defendants, not Grizzly, are responsible for shipping production equipment. As expressly stated in the Amended Tour Agreement, the $40,250,000 Second Leg Commitment that Grizzly provided to Artist was "inclusive of Artist travel, lodging, hospitality, show catering, *production*, cancelation insurance, support, and ***support production/backline***." Ex. 1 § 7(a) (emphasis added).

65.    While Grizzly advanced some production and other costs, it was not responsible for providing or contracting with entities to provide shipping and production equipment.

66.    To the point, Rod Wave Inc (not Grizzly) signed a Services Agreement with Production Resource Group, L.L.C. ("PRG Agreement"), attached hereto as Exhibit 6. Per the PRG Agreement, PRG was responsible for the "provision of equipment" for three from the date of the agreement, which was signed in August 2024. Ex. 6 §§ 1, 2.

67.    Per the Statement of Work ("<u>SOW</u>") attached to the PRG Agreement, PRG was to provide lighting, LED, rigging, media serves, cameras, and labor "[w]ith on-site PRG Personnel . . . ." *See* Ex. 6.

68.    Moreover, on information and belief, Defendants hired a company named 360 Productions to provide production services, which was responsible for shipping and loading equipment before and after each Show.

## <u>Count I</u>
### <u>(Breach of Amended Tour Agreement)</u>

69.    Grizzly reincorporates and realleges Paragraphs 1 through 68, as if fully set forth herein.

70.    The Amended Tour Agreement is a binding contract.

71.    The Amended Tour Agreement requires Artist to perform thirty-five Shows. Ex. 1 § 6.

72.    In return, Grizzly was to provide the Guarantee of $40,250,000, or $1,150,000 million per-show "inclusive of Artist travel, lodging, hospitality, show catering, production, cancelation insurance, support, and support production/backline." *Id.* § 7.

73.    To date, Artist has performed only twenty-six shows, earning 29,900,000.00.

74.    Grizzly has advanced $57,143,146.86 to Artist and/or Hit House.

75.    Therefore, Artist and/or Hit House is liable to Grizzly for $27,243,146.86.

76.    Defendants are in breach of the Amended Tour Agreement. Defendants, through counsel, expressly stated that it is not returning any of the funds advanced by Grizzly, and will "vigorously defend" all of the alleged breaches asserted by Grizzly because "the [Tour] Agreement . . . [is] no longer in effect." Ex. 5 at 2–3.

77.    As a result of Defendants' failure to repay the unearned and unrecouped advances in breach of the Amended Tour Agreement, Grizzly has suffered monetary damages in the amount of at least $27,243,146.86.

78.    In addition, as a result of Defendants' breach of the Agreements, Grizzly has also suffered other damages, including from lost deposits and lost profits from unperformed Shows, in an amount to be proven at trial.

## Count II
## (Breach of Artist Guaranty)

79.    Grizzly reincorporates and realleges Paragraphs 1 through 78, as if fully set forth herein.

80.    The Artist Guaranty is a binding contract.

81.    Per the Artist Guaranty, Artist is responsible "to return any unearned portions of the Advance(s) that becomes due and owing under the Tour Agreement." Ex. 2 § 1.

82.    As discussed above, Defendants owe Grizzly $27,243,146.86 on account of unearned and unrecouped advances.

83.    Artist is in breach of the Artist Guaranty. Artist, through counsel, expressly stated that it is not returning any of the funds advanced by Grizzly, and will "vigorously defend" all of the alleged breaches asserted by Grizzly because "the [Tour] Agreement . . . [is] no longer in effect." Ex. 5 at 2–3.

84.    As a result of Artist's breach of the Artist Guaranty, Grizzly has suffered monetary damages in the amount of at least $27,243,146.86.

85.    Grizzly also is entitled to recover "[a]ll attorneys' fees and expenses of whatsoever nature which [Grizzly] incurs in connection with the enforcement of the performance of any [Artist's] obligations under" the Artist Guaranty. Ex. 2 § 5.

## Count III
## (Unjust Enrichment in the Alternative)

86.    Grizzly reincorporates and realleges Paragraphs 1 through 85, as if fully set forth herein.

87.     In the alternative to Counts I and II, should the Court find that Hit House or Artist is not contractually obligated to reimburse Grizzly for the sums it advanced, Hit House and Artist will be unjustly enriched if they are not required to return the sums advanced by Grizzly. *Martorella v. Deutsche Bank Nat'l Tr. Co.*, 931 F. Supp. 2d 1218, 1227 (S.D. Fla. 2013) ("[A] party may plead in the alternative for relief under an express contract and for unjust enrichment.").

88.     An unjust enrichment claim requires a showing that: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1326 (S.D. Fla. 2014) (citations omitted).

89.     Grizzly has conferred a benefit on Defendants by advancing payments on their behalf. In total, minus amounts owed to Artist for the twenty-six shows he performed, Grizzly has advanced $27,243,146.86. *See* supra ¶ 35.

90.     Defendants benefitted from Grizzly's advancements by, among other things, using the equipment and services for which Grizzly advanced payment.

91.     It would be inequitable for Defendants to retain the benefit of Grizzly's advances, without reimbursing Grizzly for its payments.

## Count IV
## (Breach of Exclusivity Obligations)

92.    Grizzly reincorporates and realleges Paragraphs 1 through 91, as if fully set forth herein.

93.    The Amended Tour Agreement contains an exclusivity clause, providing that "Artist will not perform live concerts, including festivals and sell-offs, nor allow the announcement or advertising of any Artist performances other than Shows in the Territory throughout the Term, unless agreed upon by Promoter in writing . . . ." Ex. 1 § 10.

94.    Artist, through counsel, expressly stated that "the [Tour] Agreement and any exclusivity provisions contained in it are no longer in effect." Ex. 5 at 2.

95.    Moreover, Artist has launched his own touring company and, upon information and belief, plans to launch a new concert tour beginning in as early as late 2025.

96.    Upon information and belief, Artist is "planning to announce more shows for an extended North American run in December." *See* Ex. 4. Further, Artist publicly stated that he is "taking over my touring business." *See id.* More-over, Artist's agent has made statements that Artist is touring as a "as a SELF PROMOTE. He is no longer working with any other promoter companies." *Id.*

Therefore, Artist has breached the exclusivity requirements of the Tour Agreement and Amended Tour Agreement.

97.    As a result of Artist's actions, Grizzly has suffered and will continue to suffer irreparable harm, including harm to its goodwill and business reputation. In addition, Artist's actions are a clear breach of Grizzly's exclusive right to promote and market Artist's shows, which are uniquely popular.

98.    Accordingly, Grizzly seeks a preliminary and permanent injunction to enjoin Defendants.

## Count V
### (Anticipatory Breach of Amended Tour Agreement)

99.    Grizzly reincorporates and realleges Paragraphs 1 through 98, as if fully set forth herein.

100.    A prospective or anticipatory "breach of [a] contract occurs when there is absolute repudiation by one of the parties . . . ." *Gaylis v. Caminis*, 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984) (citation omitted). The repudiation may "be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute." *Id.*

101.    The Amended Tour Agreement contains an exclusivity clause, providing that "Artist will not perform live concerts, including festivals and sell-offs, nor allow the announcement or advertising of any Artist performances other

than Shows in the Territory throughout the Term, unless agreed upon by Promoter in writing . . . ." Ex. 1 § 10.

102.   Artist has clearly repudiated his exclusivity obligations under the Amended Tour Agreement, including by expressly stating, through counsel, that "the [Amended Tour] Agreement and any exclusivity provisions contained in it are no longer in effect." Ex. 5 at 2.

103.   In addition, Artist publicly stated that he is "planning to announce more shows for an extended North American run in December." *See* Ex. 4.

104.   Further, Artist has publicly stated that he is "taking over my touring business." *See id*.

105.   Artist's agent has also made statements that Artist is touring as a "self promote" and is no longer working with any other promoter companies.

106.   Therefore, Artist has anticipatorily breached his repayment and exclusivity obligations under the Amended Tour Agreement.

107.   As a result of Defendants' actions, Grizzly has suffered or will suffer: compensatory damages in the amount of at least $27,243,146.86 (~$29 million earned by Artist in twenty-six shows minus the ~$57 million advanced by Grizzly); consequential damages and/or  lost profits that Grizzly would have earned

had Artist performed all of the Shows; the loss of the right to exclusively promote and market Artist's shows; and harm to its reputation and business.

108.   Grizzly therefore requests judgment in the amount of $27,243,146.86 plus additional damages to be determined at trial, an injunction against the anticipatory breach of exclusivity, as well as costs, attorneys' fees, and such other and further relief as this Court deems just and proper.

## REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

109.   Grizzly reincorporates and realleges Paragraphs 1 through 108, as if fully set forth herein.

110.   As a result of Artist's breach or anticipatory breach of the exclusivity requirements in Section 10 of the Amended Tour Agreement, Grizzly will suffer irreparable harm from the loss of the exclusive right to promote Artist's shows, which are unique, and the loss of goodwill and harm to Grizzly's business reputation. None of these harms can be adequately compensated by monetary damages.

111.   Grizzly has a likelihood of succeeding on its claim for a breach of Section 10 because Section 10 prohibits Artist from "announc[ing] or advertising . . . any Artist performances" other than with Grizzly as the promoter, and Artist

has announced his own touring company and has began soliciting venues. More-over, Section 10 contains a right of first refusal, which Artist has refused to pro-vide.

112.    There will be minimal harm to Artist, as Grizzly simply requests that Artist comply with his obligations under the Amended Tour Agreement.

113.    Public policy favors the enforcement of binding contractual prom-ises.

114.    Accordingly, Grizzly seeks a preliminary and permanent injunction against the Artist's and Hit House's conduct in performing and touring without Grizzly, in breach of Grizzly's exclusivity rights.

## PRAYER FOR RELIEF

WHEREFORE, Grizzly demands judgment against Defendants, and prays for relief as follows:

I.    Judgment against Defendants for breach of their repayment obligations un-der the Amended Tour Agreement, and against Artist for breach of the Art-ist Guaranty, in the amount of at least $27,243,146.86;

II.    Judgment against Defendants for other direct, compensatory and/or conse-quential damages, including lost profits, suffered by Grizzly as a result of Defendants' breach of the Amended Tour Agreement, in an amount to be determined at trial;

III.   Preliminary and permanent injunctive relief preventing Artist from performing or otherwise participating in any live concert or performance in violation of his exclusivity obligations under the Amended Tour Agreement; and announcing, advertising, promoting, or marketing any show or performance where Grizzly is not the promoter; and

IV.   Such other and further relief as this Court deems just and proper.

Dated: September 29, 2025          Respectfully submitted,

*/s/ Pravin Patel*
Pravin Patel (FBN 0099939) *Lead Counsel*
Pravin.Patel@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 577-3100 (Telephone)
(305) 374-7159 (Facsimile)

David Yohai*
A.J. Green*
David.Yohai@weil.com
A.J.Green@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
(212) 310-8000 (Telephone)
(212) 310-8007 (Facsimile)
*pro hac vice motions forthcoming*

*Counsel for Grizzly Touring, LLC*