## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| GRIZZLY TOURING, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>RODARIUS MARCELL GREEN (a/k/a ROD WAVE), and HIT HOUSE ENTERTAINMENT, INC.,<br><br>Defendants. | Case No. 8:25-cv-02645-SDM-NHS<br><br>**DEMAND FOR A JURY TRIAL**<br><br>**DECLARATORY RELIEF REQUESTED** |
| RODARIUS MARCELL GREEN (a/k/a ROD WAVE), and HIT HOUSE ENTERTAINMENT, INC.,<br><br>Counterclaim Plaintiffs,<br><br>-against-<br><br>GRIZZLY TOURING, LLC,<br><br>Counterclaim Defendant. | |

## DEFENDANTS RODARIUS MARCELL GREEN (A/K/A ROD WAVE) AND HIT HOUSE ENTERTAINMENT, INC.'S ANSWER TO THE COMPLAINT WITH AFFIRMATIVE DEFENSES AND <u>COUNTERCLAIMS</u>

Defendants Rodarius Marcell Green ("<u>Rod Wave</u>") and Hit House

Entertainment, Inc. ("<u>Hit House</u>," and together with Rod Wave, "<u>Defendants</u>"), by

1

and through their undersigned counsel, hereby answer the Complaint of Grizzly Touring, LLC ("Grizzly") as follows:

## **RESPONSE TO PRELIMINARY STATEMENT**[1]

1.      Defendants admit that Grizzly has commenced the instant lawsuit asserting various contract-related claims, but deny liability for such claims and deny that Grizzly is entitled to any relief.  Defendants deny the remaining allegations in Paragraph 1.

2.      Paragraph 2 purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 2 are inconsistent with the referenced document, Defendants deny them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 concerning Grizzly's description of its professional activities, and on that basis denies them. Defendants deny the remaining allegations in Paragraph 2.

3.      Defendants deny the allegations in Paragraph 3 of the Complaint and specifically aver as follows:

---

[1] Defendants restate the complaint's headings for convenience only, and deny any allegations contained therein.

(i)     Grizzly fell short of its contractual obligations in the Amended Tour Agreement and is in breach of its obligations thereunder.  Grizzly has not at "all times sought to be a helpful and supportive business partner" who is trying to "help [Rod Wave] grow his career."  Through this lawsuit, Grizzly seeks to stall Rod Wave's career by preventing him from touring.

(ii)    Defendants specifically deny the allegations in Paragraph 3 that the "Amended Tour Agreement was itself a concession" just to give Rod Wave a "better deal."  In the Amended Tour Agreement, Grizzly acknowledged that it "wish[ed] to increase the Second Leg show capacity by implementing a round configuration with a minimum of 360 degrees."  (Amended Tour Agreement, Recitals.)

4.     Defendants deny the allegations in Paragraph 4 of the Complaint, and specifically aver that Grizzly volunteered to cover costs incurred by Defendants following Grizzly's breaches of the Amended Tour Agreement and its attempts at rescheduling Shows on the Second Leg of the tour thereafter.

5.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5, and on that basis deny them.

6.     The allegations in Paragraph 6 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants

3

deny them.  Paragraph 6 further purports to describe and/or summarize the contents of an Artist Guaranty of Performance dated February 1, 2024, attached as Exhibit 2 to the Complaint (the "Artist Guaranty,"), which speaks for itself.  Defendants respectfully refer the Court to the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 6 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 6.

7.    The allegations in Paragraph 7 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny them. Defendants deny the remaining allegations in Paragraph 7.

8.    The allegations in Paragraph 8 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny them. Defendants deny the allegations in Paragraph 8 of the Complaint, and specifically aver as follows:

   (i)    It is Grizzly who breached its obligations, and the Amended Tour Agreement – and any exclusivity provisions therein – is no longer of force or effect as a result of Grizzly's breaches.

   (ii)    The Shows during the *Last Lap* tour were cancelled or rescheduled as a result of poor scheduling and routing by Grizzly and critically, Grizzly only alleges that Defendants signed off on

the schedule and route for the *original* tour schedule and *not* the rescheduled tour over eight months later.

(iii)    Defendants deny the insinuation that it was *only* Rod Wave who desired to increase the scale of production for the *Last Lap* tour. In the Amended Tour Agreement, Grizzly acknowledged that it "wish[ed] to increase the Second Leg show capacity by implementing a round configuration with a minimum of 360 degrees." (Amended Tour Agreement, Recitals.) Defendants deny that Grizzly "did nothing but help [Rod Wave] navigate the[ ] issues," as Grizzly made unilateral, onerous and inexplicable rescheduling and rerouting decisions that amounted to a breach of the Amended Tour Agreement.

9.    Defendants deny the allegations in Paragraph 9, and specifically aver that Grizzly did not make "good faith efforts to resolve these issues amicably." Once Grizzly received a response from Defendants' counsel requesting information including a breakdown of its requested amounts, Grizzly did not respond and filed this lawsuit instead.

## RESPONSE TO GENERAL ALLEGATIONS

**I.    Response to Parties, Jurisdiction, and Venue**

10.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and on that basis denies them.

11.    Defendants deny the allegations in Paragraph 11 of the Complaint.

12.    Defendants admit the allegations in Paragraph 12 of the Complaint.

13.    The allegations in Paragraph 13 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 13.

14.    The allegations in Paragraph 14 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 14.

15.    The allegations in Paragraph 15 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 15.

**II.    Response to The Parties**

16.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and on that basis denies them.

17.    Defendants admit the allegations in Paragraph 17 of the Complaint.

**III.    Response to The Original Tour Agreement, Amended Tour Agreement, and Artist Guaranty**

18.    Defendants admit that AG Entertainment promoted Rod Wave's *Beautiful Mind* tour in 2022.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18, and on that basis deny them.

19.    Paragraph 19 purports to describe and/or summarize the contents of the Original Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Original Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 19 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 19.

20.    Paragraph 20 purports to describe and/or summarize the contents of the Original Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Original Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 20 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 20.

21.    Paragraph 21 purports to describe and/or summarize the contents of the Original Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Original Tour Agreement for its complete, accurate contents; to the

7

extent that the allegations in Paragraph 21 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 21.

22.    Defendants admit that Rod Wave performed the first of the two tour legs, and otherwise deny knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 22, on that basis deny them.

23.    Defendants deny the allegation in Paragraph 23 and specifically aver that in the Amended Tour Agreement, Grizzly also indicated that it "wish[ed] to increase the Second Leg show capacity by implementing a round configuration with a minimum of 360 degrees." Defendants deny the remaining allegations in Paragraph 23.

24.    Paragraph 24 purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself. Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 24 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 24.

25.    Paragraph 25 purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself. Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the

8

extent that the allegations in Paragraph 25 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 25.

26.    Paragraph 26 purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 26 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 26.

27.    Paragraph 27 purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 27 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 27.

28.    Paragraph 28 purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 28 are inconsistent with the referenced

document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 28.

29.    Defendants admit that Rod Wave executed the Artist Guaranty, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint and on that basis deny them.

30.    Paragraph 30 purports to describe and/or summarize the contents of the Artist Guaranty, which speaks for itself. Defendants respectfully refer the Court to the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 30 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 30.

31.    Paragraph 31 purports to describe and/or summarize the contents of the Artist Guaranty, which speaks for itself. Defendants respectfully refer the Court to the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 31 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 31, and specifically aver that the Artist Guaranty permits Defendants to assert claims against Grizzly in connection with the Artist Guaranty where Grizzly is "in breach of the Tour Agreement." (Artist Guaranty § 6.)

32.    Paragraph 32 purports to describe and/or summarize the contents of the Artist Guaranty, which speaks for itself. Defendants respectfully refer the Court to

the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 32 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 32.

33.     Paragraph 33 purports to describe and/or summarize the contents of the Artist Guaranty, which speaks for itself. Defendants respectfully refer the Court to the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 33 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 33.

34.     Paragraph 34 purports to describe and/or summarize the contents of the Artist Guaranty, which speaks for itself. Defendants respectfully refer the Court to the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 34 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 34.

## IV.    Response to Artist Abandons the *Last Lap* Tour and Launches His Own Touring Company

35.     The allegations in Paragraph 35 state legal conclusions for which no response is required. To the extent any further response is required, Defendants deny the allegations in Paragraph 35, and specifically aver that any "additional" costs Grizzly chose to cover in connection with the Second Leg constituted an "advance" under the Tour Agreement, the Amended Tour Agreement, or the Artist Guaranty. Defendants otherwise deny the allegations in Paragraph 35.

36.     Defendants admit the allegations in Paragraph 36 of the Complaint.

37.     Defendants deny the allegations in Paragraph 37, and specifically aver that that Grizzly did not work to obtain Rod Wave's mutual agreement as to dates, location, and routing for Shows on the Second Leg.

38.     Defendants admit only that they approved particular dates, schedules and routes for the *Last Lap* tour before it was announced, otherwise deny the allegations in Paragraph 38, and specifically aver that Grizzly rescheduled and rerouted the *Last Lap* tour without Defendants' mutual agreement.

39.     Defendants admit only that the *Last Lap* tour was significantly larger and more extensive than the production for the previous tour, deny the remaining allegations in Paragraph 39, and specifically aver that (i) Grizzly was incapable of promoting "a significantly larger and more extensive" tour and that (ii) Grizzly's provided production manager, LeShun Williams of 360 Production, was unable to efficiently manage production.

40.     Defendants admit only that due to production issues caused by the production manager provided by Grizzly, and the subsequent production issues caused by Grizzly's unilateral, onerous and inexplicable rescheduling and rerouting decisions, Shows were cancelled and/or rescheduled and the tour was extended beyond the originally scheduled completion date.  Defendants deny the remaining allegations in Paragraph 40.

41.    Defendants admit only that production issues arose as a result of the incompetence of the production manager provided by Grizzly, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and on that basis deny them.

42.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, denies them on that basis, and specifically avers that any "production issues" resulted from the incompetence of the production manager provided by Grizzly, as well as Grizzly's unilateral, onerous and inexplicable rescheduling and rerouting decisions.

43.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 of the Complaint and on that basis denies them.

44.    Defendants deny the allegations in Paragraph 44 and specifically aver that Rod Wave completed at least twenty-eight Shows.

45.    The allegations in Paragraph 45 contain legal conclusions for which no response is required. To the extent a response is required, Defendants deny those allegations.  Defendants deny the remaining allegations in Paragraph 45 and respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 45 are inconsistent

with the referenced document, Defendants deny them.  Defendants admit that Rod Wave earned *at minimum* $29,900,000.00 under the Amended Tour Agreement.

46.    Defendants deny that any sums provided by Grizzly beyond the $20,125,000 advance referenced in the Amended Touring Agreement constitutes any "advance" under the Original Tour Agreement, the Amended Tour Agreement or the Arist Guaranty.  Defendants deny the remaining allegations in Paragraph 46.

47.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 of the Complaint and on that basis deny them.

48.    Defendants deny that Defendants owe Grizzly any amounts under the Amended Tour Agreement and/or the Artist Guaranty.  The allegations in Paragraph 48 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 48, deny that any conduct by Defendant damaged Grizzly, and deny that Grizzly is entitled to any relief.  Paragraph 48 further purports to interpret the Amended Tour Agreement and the Artist Guaranty, which documents speak for themselves.  Defendants respectfully refer the Court to the Amended Tour Agreement and Artist Guaranty for their complete, accurate contents; to the extent that the allegations in Paragraph 48 are inconsistent with the referenced documents, Defendants deny them.

14

49.    Paragraph 49 purports to describe and/or summarize the contents of a publication by Billboard attached as Exhibit 4 to the Complaint (the "Billboard Article"), which speaks for itself.  Defendants respectfully refer the Court to the Billboard Article for its complete, accurate contents; to the extent that the allegations in Paragraph 49 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 49.

50.    The first sentence in Paragraph 50 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 50.  Paragraph 50 further purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 50 are inconsistent with the referenced document, Defendants deny them.  Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, deny them on that basis, and specifically aver that when Grizzly rescheduled and rerouted the *Last Lap* tour, it failed to obtain Rod Wave's mutual agreement as to dates, location, and routing.

51.    The first sentence in Paragraph 51 of the Complaint states a legal conclusion to which no response is required. To the extent a response is required,

Defendants deny the allegations in the first sentence of Paragraph 51. Paragraph 51 further purports to describe and/or summarize the contents of the Billboard Article, which speaks for itself. Defendants respectfully refer the Court to the Billboard Article for its complete, accurate contents; to the extent that the allegations in Paragraph 51 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 51.

52.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52, and on that basis deny them.

53.    Defendants admit the allegations in Paragraph 53, and specifically aver that Defendants have lost confidence in Grizzly's competence and capabilities as a tour promoter.

## V.    Response to Artist Refuses to Comply with the Amended Tour Agreement and Artist Guaranty

54.    Defendants admit that Grizzly sent a letter in July 2025. To the extent Paragraph 54 purports to describe and/or summarize the contents of any letter, the contents of such letters speak for themselves; to the extent that the allegations in Paragraph 54 are inconsistent with any letter, Defendants deny them. Defendants deny the remaining allegations in Paragraph 54.

55.    Defendants admit only that their counsel sent a letter to Grizzly on September 18, 2025 attached as Exhibit 5 to the Complaint (the "Response Letter"). Defendants deny the remaining allegations in Paragraph 55.

56.     Paragraph 56 purports to describe and/or summarize the contents of the Response Letter, which speaks for itself.  Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 56 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 56, and deny that Grizzly is entitled to any relief.

57.     Paragraph 57 purports to describe and/or summarize the contents of the Response Letter, which speaks for itself.  Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 57 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 57.

58.     Paragraph 58 purports to describe and/or summarize the contents of the Response Letter, which speaks for itself.  Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 58 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 58, and deny that Grizzly is entitled to any relief.

59.     Paragraph 59 purports to describe, summarize and/or interpret the Amended Tour Agreement and the Artist Guaranty, which speak for themselves. Defendants respectfully refer the Court to the Amended Tour Agreement and Artist

Guaranty for their complete, accurate contents; to the extent that the allegations in Paragraph 59 are inconsistent with the referenced documents, Defendants deny them. Paragraph 59 further states legal conclusions to which no response is required. To the extent a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 of the Complaint and on that basis deny them. Defendants deny the remaining allegations in Paragraph 59, and deny that Grizzly is entitled to any relief.

60.    The allegations in Paragraph 60 of the Complaint state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 60. Defendants deny the remaining allegations in Paragraph 60.

61.    Paragraph 61 purports to describe and/or summarize the contents of the Response Letter, which speaks for itself. Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 61 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 61.

62.    Defendants deny the allegations in the first sentence of Paragraph 62. Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62, denies them on that basis, and

specifically aver that when Grizzly rescheduled and rerouted the *Last Lap* tour, it failed to obtain Defendants' mutual agreement as to dates, location, and routing.

63.    Paragraph 63 purports to describe and/or summarize the contents of the Response Letter, which speaks for itself.  Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 63 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 63.

64.    The allegations in the first sentence of Paragraph 64 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 64.  Paragraph 64 further purports to describe and/or summarize the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 64 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 64.

65.    The allegations in Paragraph 65 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 65, and specifically aver that (i) Grizzly provided 360 Production to Defendants, (ii)

19

made them believe that they could not choose another production manager, and (iii) Rod Wave never executed an agreement with 360 Production, who acted under the direction of Grizzly.

66.    Defendants deny the existence of an entity named "Rod Wave Inc." and specifically aver that the agreement between "Rod Wave Inc" and Production Resource Group, L.L.C. attached as Exhibit 6 to the Complaint ("PRG Agreement") was signed by LeShun Williams of 360 Production without Defendants' consent or knowledge.  Paragraph 66 further purports to describe, summarize and/or interpret the PRG Agreement, which speaks for itself.  Defendants respectfully refer the Court to the PRG Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 66 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 66.

67.    Paragraph 67 of the Complaint purports to describe, summarize and/or interpret the PRG Agreement, which speaks for itself.  Defendants respectfully refer the Court to the PRG Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 67 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 67.

68.    Defendants deny the allegation in Paragraph 68 that Defendants hired 360 Productions to provide production services, and specifically aver that (i) Grizzly provided Defendants with 360 Production, (ii) made them believe that they could

not choose another production manager, and (iii) Rod Wave never executed an agreement with 360 Production, who instead acted under the direction of Grizzly.

### **Response to Count I**
### **(Breach of Amended Tour Agreement)**

69.     Defendants repeat and reallege the answers above as though fully set forth herein.

70.     Defendants admit that the Amended Tour Agreement was a binding contract before it was terminated as a result of Grizzly's breaches thereunder. Defendants deny any allegation that the Amended Tour Agreement is still binding upon Defendants.

71.     Paragraph 71 purports to describe, summarize and/or interpret the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 71 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 71.

72.     Paragraph 72 purports to describe, summarize and/or interpret the contents of the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 72 are inconsistent

with the referenced document, Defendants deny them.    Defendants deny the remaining allegations in Paragraph 72.

73.    Defendants deny the allegations in Paragraph 73 of the Complaint and specifically aver that Rod Wave completed at least twenty-eight Shows.    The allegations in Paragraph 73 of the Complaint further state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Paragraph 73 further purports to interpret the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 73 are inconsistent with the referenced document, Defendants deny them. Defendants admit that Rod Wave earned no less than $29,900,000 under the Amended Tour Agreement's guaranteed Commitment to Rod Wave.

74.    Defendants deny the allegations of Paragraph 74 of the Complaint, and further deny that any payments to Rod Wave above the $20,125,000 advance set forth in the Amended Tour Agreement constituted an "advance" contemplated by, covered by, and/or applicable to the Original Tour Agreement, the Amended Tour Agreement or the Artist Guaranty.

75.    The allegations in Paragraph 75 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required,

Defendants deny the allegations in Paragraph 75.  Defendants deny that Grizzly is entitled to any relief.

76.    The allegations in the first sentence of Paragraph 76 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 76.  The remainder of Paragraph 76 purports to describe and/or summarize the contents of the Response Letter, which speaks for itself.  Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 76 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 76.

77.    The allegations in Paragraph 77 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 77, deny that Grizzly has suffered damages, and deny that Grizzly is entitled to any relief.

78.    The allegations in Paragraph 78 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 78, deny that Grizzly has suffered damages, and deny that Grizzly is entitled to any relief.

## Response to Count II
## (Breach of Artist Guaranty)

79.     Defendants repeat and reallege the answers above as though fully set forth herein.

80.     Defendants admit that the Artist Guaranty is a binding contract.

81.     Paragraph 81 purports to describe, summarize and/or interpret the contents of the Artist Guaranty, which speaks for itself.  Defendants respectfully refer the Court to the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 81 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 81.

82.     The allegations in Paragraph 82 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 82, and deny that any costs covered by Grizzly over and above the $20,125,000 advance identified in the Amended Tour Agreement constitute an "advance" contemplated by, covered by, and/or applicable to the Original Tour Agreement, the Amended Tour Agreement, or the Artist Guaranty.  Defendants deny the remaining allegations in Paragraph 82, and deny that Grizzly is entitled to any relief.

83.     The allegations in the first sentence of Paragraph 83 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 83.  The

24

remainder of Paragraph 83 purports to describe and/or summarize the contents of the Response Letter, which speaks for itself. Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 83 are inconsistent with the referenced document, Defendants deny them.

84.    The allegations in Paragraph 84 of the Complaint state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 84, and deny that Grizzly is entitled to any relief.

85.    Paragraph 85 purports to describe, summarize and/or interpret the contents of the Artist Guaranty, which speaks for itself. Defendants respectfully refer the Court to the Artist Guaranty for its complete, accurate contents; to the extent that the allegations in Paragraph 85 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 85, and deny that Grizzly is entitled to any relief.

**<u>Response to Count III</u>**
**<u>(Unjust Enrichment in the Alternative)</u>**

86.    Defendants repeat and reallege the answers above as though fully set forth herein.

87.    The allegations in Paragraph 87 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 87.

88.    The allegations in Paragraph 88 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 88.

89.    The allegations in Paragraph 89 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 89, deny that any costs covered by Grizzly over and above the $20,125,000 advance in the Amended Tour Agreement constitute an "advance" contemplated by, covered by, and/or applicable to the Original Tour Agreement, the Amended Tour Agreement or the Artist Guaranty, and deny that Grizzly is entitled to any relief.

90.    The allegations in Paragraph 90 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 90.

91.    The allegations in Paragraph 91 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 91, and deny that Grizzly is entitled to any relief.

## Response to Count IV
## (Breach of Exclusivity Obligations)

92.     Defendants repeat and reallege the answers above as though fully set forth herein.

93.     Paragraph 93 purports to describe, summarize and/or interpret the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 93 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 93.

94.     Paragraph 94 purports to describe and/or summarize the Response Letter, which speaks for itself.  Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 94 are inconsistent with the referenced document, Defendants deny them.  Defendants deny the remaining allegations in Paragraph 94.

95.     Defendants admit the allegations in Paragraph 95, and specifically aver that Defendants have lost confidence in Grizzly's competence and capabilities as a tour promoter.

96.     Paragraph 96 purports to describe and/or summarize the contents of the Billboard Article, which speaks for itself.  Defendants respectfully refer the Court to the Billboard Article for its complete, accurate contents; to the extent that the

27

allegations in Paragraph 96 are inconsistent with the referenced document, Defendants deny them. The last sentence of Paragraph 96 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the last sentence of Paragraph 96.

97.    The allegations in Paragraph 97 of the Complaint state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 97, deny that Grizzly has or will suffer any harm, and deny that Grizzly is entitled to any relief.

98.    Defendants admit that Grizzly purports to seek injunctive relief in this matter. Defendants deny that Grizzly is entitled to injunctive relief, which effectively seeks to compel Rod Wave to specifically perform for his former touring promoter, Grizzly, in whom he has utterly lost confidence.

## Response Count V
### (Anticipatory Breach of the Amended Tour Agreement)

99.    Defendants repeat and reallege the answers above as though fully set forth herein.

100.    The allegations in Paragraph 100 state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 100.

101.    Paragraph 101 purports to describe and/or summarize the Amended Tour Agreement, which speaks for itself. Defendants respectfully refer the Court to

the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 101 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 101.

102. The allegations in Paragraph 102 state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 102. Paragraph 102 further purports to describe and/or summarize the Response Letter, which speaks for itself. Defendants respectfully refer the Court to the Response Letter for its complete, accurate contents; to the extent that the allegations in Paragraph 102 are inconsistent with the referenced document, Defendants deny them. Defendants deny the remaining allegations in Paragraph 102.

103. Paragraph 103 purports to describe and/or summarize the Billboard Article, which speaks for itself. Defendants respectfully refer the Court to the Billboard Article for its complete, accurate contents; to the extent that the allegations in Paragraph 103 are inconsistent with the referenced document, Defendants deny them.

104. Paragraph 104 purports to describe and/or summarize the Billboard Article, which speaks for itself. Defendants respectfully refer the Court to the Billboard Article for its complete, accurate contents; to the extent that the allegations

in Paragraph 104 are inconsistent with the referenced document, Defendants deny them.

105.  Paragraph 105 purports to describe and/or summarize the Billboard Article, which speaks for itself.  Defendants respectfully refer the Court to the Billboard Article for its complete, accurate contents; to the extent that the allegations in Paragraph 105 are inconsistent with the referenced document, Defendants deny them.

106.  The allegations in Paragraph 106 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 106.

107.  The allegations in Paragraph 107 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 107.  Defendants deny that any costs covered by Grizzly over and above the $20,125,000 advance in the Amended Tour Agreement constitute an "advance" contemplated by, covered by, and/or applicable to the Original Tour Agreement, the Amended Tour Agreement or the Artist Guaranty.  Defendants further deny that Grizzly has incurred any harm and deny that Grizzly is entitled to any relief.

108.   Defendants admit that, in this matter, Grizzly requests the relief set forth in Paragraph 108 of the Complaint.  Defendants deny that Grizzly is entitled to any of its requested relief.

## RESPONSE TO REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

109.   Defendants repeat and reallege the answers above as though fully set forth herein.

110.   The allegations in Paragraph 110 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 110.  Defendants deny that Grizzly will suffer any of the harms alleged in Paragraph 110, and deny that Grizzly is entitled to any relief.

111.   The allegations in Paragraph 111 of the Complaint state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 111.  Paragraph 111 further purports to describe and/or summarize the Amended Tour Agreement, which speaks for itself.  Defendants respectfully refer the Court to the Amended Tour Agreement for its complete, accurate contents; to the extent that the allegations in Paragraph 111 are inconsistent with the referenced document, Defendants deny them.  Defendants deny that Section 10 of the Amended Tour Agreement applies because the Amended Tour Agreement and the exclusivity provision therein are no longer of force or effect.  Defendants deny that the Right of First Refusal under Section 10 of the Amended

Tour Agreement applies because it only applies "while this agreement is in effect." (Amended Tour Agreement ¶ 10.)

112.   The allegations in Paragraph 112 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 112.  Defendants further deny that Grizzly can "simply request[ ] that [Rod Wave] comply with his obligations under the Amended Tour Agreement" through a request for injunctive relief, which effectively and improperly seeks to compel Rod Wave to specifically perform a personal services contract with his former promoter, in whom he has utterly lost confidence, and which amounts to an indentured servitude.  Defendants specifically aver that restraining Rod Wave from touring will cause them irreparable harm, including to reputation.

113.   The allegations in Paragraph 113 state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 113.

114.   Defendants admit that Grizzly purports to seek injunctive relief in this matter but deny that Grizzly is entitled to any relief.  The allegations in Paragraph 114 of the Complaint concerning any purported "breach of Grizzly's exclusivity rights" states a legal conclusion to which no response is required.

## RESPONSE TO PRAYER FOR RELIEF

To the extent a response to Grizzly's "prayer for relief" is required, Defendants deny the allegations contained in Grizzly's "prayer for relief," and deny that Grizzly is entitled to any such relief.

## GENERAL DENIAL

Defendants deny each and every allegation set forth in the Complaint that is not specifically admitted herein.

## AFFIRMATIVE DEFENSES

Defendants incorporate by reference into their Affirmative Defenses each of their responses and allegations in the Answer and Counterclaims.

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

Grizzly failed to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Grizzly's Prior Breach)

Sections 5 and 6 of the Amended Tour Agreement required Grizzly to schedule Shows on "mutually agreeable dates," to be performed at "mutually agreeable venues (subject to routing)," with the "right to promote any additional mutually agreeable dates on a good faith basis." Grizzly's unilateral, onerous and inexplicable scheduling and routing decisions constituted prior breaches of those provisions.

33

## THIRD AFFIRMATIVE DEFENSE
### (Impossibility and Impracticability)

Sections 5 and 6 of the Amended Tour Agreement required Grizzly to schedule Shows on "mutually agreeable dates," to be performed at "mutually agreeable venues (subject to routing)," with the "right to promote any additional mutually agreeable dates on a good faith basis."  Grizzly's unilateral, onerous and inexplicable scheduling and routing decisions, constituting prior breaches of those provisions, rendered it commercially impracticable, if not impossible, for Defendants to perform their remaining obligations under the Amended Tour Agreement.

## FOURTH AFFIRMATIVE DEFENSE
### (Frustration of Purpose)

Sections 5 and 6 of the Amended Tour Agreement required Grizzly to schedule Shows on "mutually agreeable dates," to be performed at "mutually agreeable venues (subject to routing)," with the "right to promote any additional mutually agreeable dates on a good faith basis."   Grizzly's unilateral, onerous and inexplicable scheduling and routing decisions, constituting prior breaches of those provisions, were outside of Defendants' control and frustrated the purposes and basic assumptions upon which the contract was made.

## FIFTH AFFIRMATIVE DEFENSE
### (Negligent Supervision)

Grizzly provided 360 Production to Defendants to manage production of the tour.  Defendants never executed an agreement with 360 Production, who acted solely under Grizzly's direction.  Grizzly – as the provider, sole director of 360 Production's acts, and Defendants' promoter – had a legal duty to supervise 360 Production on Defendants' behalf.  Grizzly was negligent in fulfilling these duties, causing Defendants harm.  In one egregious example, 360 Production executed a contract on behalf of a fictitious entity bearing Rod Wave's professional name without Defendants' authority.

## SIXTH AFFIRMATIVE DEFENSE
### (Illegality)

Under Florida law, contracts which restrict and prohibit competition in trade and commerce during or after the term of a restrictive covenant, and which are not reasonable in time, are prohibited by Florida Statutes § 542.335.  The Amended Tour Agreement and the exclusivity clause therein do not contain any limitation on time and are thus void as an illegal restraint on trade.

## SEVENTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

Grizzly's failures and breaches stemming from its unilateral, onerous and inexplicable scheduling and routing decisions, certain payments to Beau Williams, as well as its provision of 360 Production to manage production,

35

precipitated the precise conduct for which it purports seeks to hold Defendants liable. Defendants, in turn, were directly injured by Grizzly's failures and breaches.

## **RESERVATION OF RIGHTS**

Defendants presently have insufficient knowledge or information upon which to form a belief as to whether there may be other, as yet unstated, defenses available to them, and therefore expressly reserve the rights (i) to amend or supplement the Answer and affirmative defenses and all other pleadings, and (ii) to assert any and all additional defenses under any applicable law in the event that discovery indicates such defenses would be appropriate.

## COUNTERCLAIMS

Defendants and Counterclaim-Plaintiffs Rodarius Marcell Green *p/k/a* Rod Wave ("Rod Wave") and Hit House Entertainment, Inc. ("Hit House") hereby bring the following counterclaims against Plaintiff and Counterclaim-Defendant Grizzly Touring, LLC:

## PRELIMINARY STATEMENT

1. Following a failed attempt by Grizzly's parent company at bribing Rod Wave's former agent with under-the-table payments to gain the exclusive right to Rod Wave's next five tours, Grizzly's lawsuit represents an improper effort to force Rod Wave to specifically perform a personal services contract for Grizzly against his will. Indeed, through its complaint ("Complaint" or "Compl."), Grizzly purports to seek preliminary and permanent injunctive relief enjoining Defendants from "performing and touring *without Grizzly*" or "announcing, advertising, promoting, or marketing any show or performance *where Grizzly is not the promoter*," and "requests that [Rod Wave] *comply* with his obligations under the Amended Tour Agreement." (Compl. ¶¶ 112, 114, Prayer for Relief ¶ III (emphasis added).) Grizzly is not entitled to this improperly requested specific performance or equivalent injunctive relief, which effectively amounts to an indentured servitude. Defendants have lost confidence in Grizzly as their tour promoter, and no longer wish to perform services for Grizzly or receive Grizzly's services. Moreover, Grizzly's breaches of

1

its own contractual obligations have caused Defendants monetary damages and reputational harm.

2.    Rod Wave is a critically acclaimed recording and performing artist whose rapid ascension to fame is due to his powerful live performances and soulful connection with audiences.

3.    Having previously worked with Grizzly's parent companies – AG Entertainment Touring, LLC ("AG Entertainment") and Mammoth Inc. ("Mammoth") – on a prior successful tour (albeit with many fewer shows than the tour at issue here), Rod Wave agreed to launch a new tour with these promoters.

4.    AG Entertainment and Mammoth had just formed a new entity, Grizzly, as part of the creation of a joint venture with CTS Eventim Ag & Co. KGaA ("CTS Eventim"), a global superpower in the live concert industry with annual revenues approaching €3 billion.  Based upon Rod Wave's previous experience with AG Entertainment and Mammoth – and their representations as to Grizzly's ability to promote a 70-show (the "Shows") tour (separated into two legs of 35 shows, each a "Leg") – Rod Wave signed an agreement with Grizzly to promote the tour.  (*See* Original Tour Agreement, attached to the Complaint as Exhibit 3.)

5.    It initially appeared that Grizzly could competently function as tour promoter, and the First Leg of the tour was a tremendous success, netting Grizzly tens of millions of dollars.

6.    Seeking to capitalize upon Rod Wave's ever-growing popularity, Grizzly and Rod Wave amended the Original Tour Agreement in February 2024 (*see* Amended Tour Agreement, attached to the Complaint as Exhibit 1).  The Amended Tour Agreement memorialized the parties' shared desire "to increase the Second Leg show capacity by implementing a round configuration with a minimum of 360 degrees."  (Amended Tour Agreement, Recitals.)

7.    Around the same time, AG Entertainment attempted to partner with Rod Wave's agent in an underhanded attempt to gain the exclusive right of first refusal to promote Rod Wave's next *five* tours.  In fact, following the receipt of a large sum of payments from AG Entertainment, Rod Wave's former agent presented him with a copy of the Amended Tour Agreement which included undisclosed extra pages containing a never-previously-discussed extended right of first refusal in AG Entertainment's favor.  Displeased with the attempt to sneak-in this material deal term, Rod Wave rejected it, refusing to tether his future to AG Entertainment indefinitely.

8.    Soon after it commenced, the Second Leg quickly became marred by Grizzly's last-minute rescheduling and rerouting of shows, as well as major production failures.

9.    The production company *provided by Grizzly* – whom Grizzly led Rod Wave to believe he had to use and with whom Rod Wave never executed a contract

– proved incapable of handling the larger scope of production necessary for the reenvisioned Second Leg.

10.    Grizzly thereafter made frantic and erratic attempts at rescheduling and rerouting the shows in the Second Leg, in breach of its obligations under the Amended Tour Agreement to schedule Shows at "mutually agreeable" venues and dates.  (Amended Tour Agreement ¶¶ 5, 6.)  Through the Complaint, Grizzly sidesteps this continuing obligation of mutuality, alleging only that it received Rod Wave's mutual agreement for the *original* touring schedule, not the revised and rerouted touring schedule.  (*Cf.* Compl. ¶¶ 8, 62.)

11.    Grizzly's improper and inadequate rescheduling and rerouting efforts resulted in an array of production issues.  For example, stage sets and the technical equipment necessary to perform were not shipped or loaded in on time.  These production issues led to sub-standard shows and, ultimately, cancelled shows.

12.    These failures constitute material breaches of Grizzly's duties and obligations under the Amended Tour Agreement, and it ultimately became impossible for Rod Wave to continue covering the costs of the Second Leg and ultimately to complete it.

13.    In recognition of its breaches, Grizzly agreed to cover the remaining costs of production, but such payments were not "advances" under the Original Tour

Agreement, the Amended Tour Agreement, or the Artist Guaranty (attached as Exhibit 2 to the Complaint).

14.     However, even with Grizzly agreeing to cover these additional costs, the production quality deteriorated as the (erratically) rescheduled Shows wore on. Unwilling to disappoint fans with last-minute postponements, cancellations and sub-standard shows, and unwilling to have his reputation be further tarnished, Rod Wave was left with no option but to cancel the remaining tour dates.

15.     On January 28, 2025, Rod Wave took to social media to break the news to his fans:



16.     The backlash was severe, as fans were understandably outraged.[2]

17.     Now, having failed in its underhanded effort to lock Rod Wave into the next five tours, having breached the Amended Tour Agreement's scheduling provisions and seeking to squeeze every last dollar from Rod Wave that it can, Grizzly seeks to compel Rod Wave to specifically perform the Amended Tour Agreement (which is a personal services contract).  (*See* Compl. ¶¶ 112, 114, Prayer for Relief ¶ III.)  To coerce Rod Wave to perform again for Grizzly, Grizzly also seeks repayment of $27,243,146.86 – amounts that Grizzly incorrectly alleges were advanced pursuant to the Amended Tour Agreement and Artist Guaranty.

18.     Accordingly, Rod Wave seeks judicial declarations from this Court that (i) the Amended Tour Agreement and the exclusivity provisions therein are of no further force or effect and that Defendants cannot be compelled to perform additional Shows with Grizzly as promoter, including because of personal service contract principles, and (ii) Defendants do not owe Grizzly any monies under the Amended Tour Agreement, the Artist Guaranty or otherwise.  Rod Wave also seeks monetary damages stemming from Grizzly's breach of the Amended Tour Agreement and the implied covenant of good faith and fair dealing, and the associated reputational harm suffered by Rod Wave as a result.

---

[2] https://www.iheart.com/content/2025-01-30-rod-wave-addresses-fans-after-backlash-over-last-minute-tour-cancellations/; https://ticketx.com/magazine/music/how-to-get-cheap-rod-wave-tickets-today

**PARTIES**

19.    Defendant and Counterclaim-Plaintiff Rod Wave is an individual who is a resident of the State of Georgia.

20.    Defendant and Counterclaim-Plaintiff Hit House is a Florida Corporation with its principal place of business in St. Petersburg, Florida.

21.    As pled in Grizzly's Complaint, Grizzly is a Delaware limited liability company with its principal place of business in Kansas.  Grizzly alleges it has two members: (i) Sabertooth Touring LLC ("Sabertooth"); (ii) AG Entertainment Touring.  Sabertooth is alleged to be a Delaware limited liability company with its principal place of business in Kansas.  Sabertooth has two members: (a) Mammoth and (b) Eventim Live USA, Inc. ("Eventim Live USA").  Mammoth is alleged to be a Kansas corporation with its principal place of business in New York.  AG Entertainment is alleged to be a Georgia limited liability company with its principal place of business in Atlanta, Georgia.  AG Entertainment's sole member is alleged to be James Crawford, who is a resident of Georgia.

**JURISDICTION AND VENUE**

22.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Defendants and Counterclaim-Plaintiffs are not residents of the same state as Plaintiff and Counterclaim-Defendant.

23.    Venue is proper in the Middle District of Florida pursuant to, *inter alia*, 28 U.S.C. § 1391.

24.    This Court has personal jurisdiction over Plaintiff and Counterclaim-Defendant Grizzly because it consented to jurisdiction in this Court via the filing of the Complaint.

## FACTUAL BACKGROUND

### A.    Plaintiff and Counterclaim-Defendant and Its Members Are Concert Promoting Giants

25.    Grizzly alleges that it is a promoter of large-scale arena concerts for hip hop and other artists, which has been characterized as a "concert giant." Grizzly alleges that, upon its formation on January 18, 2023, Grizzly became an immediate part of a powerful global conglomerate comprised of some of the largest players in the live concert industry.

26.    AG Entertainment is a large-scale concert promoter, including for "One Musicfest 2025," the "Southeast's Premier Celebration of Black Music & Culture" featuring over forty artists and "legendary lineup" including artists such as Future, Mary J. Blige, Ludacris, Doechii, The Roots, and Busta Rhymes. [3]    AG

---

[3] https://www.agentertainment.com/

8

Entertainment touts itself as an "elite worldwide touring company [which] brings the biggest and hottest artists in the music game to cities across the U.S."[4]

27.    Mammoth is an event production company, which touts itself as "one of the most prominent independent promoters" and which also oversees the operations and ownership of several theaters.  Mammoth "holds relationships with promoters and venues, works with agents to route shows, markets tour dates with regional and national partners, as well as coordinates the day of show operations and production."[5]

28.    Eventim Live USA's parent company is CTS Eventim.  (D.E. 4 at 2.) CTS Eventim is a promoter giant based in Germany and is the number one ticketing provider in Europe and the number two ticketing provider worldwide, which also operates some of Europe's most renowned event venues and generated revenues of €2.8 billion in 2024.[6]

29.    On March 21, 2023, Mammoth and AG Entertainment formed Grizzly, a joint venture with CTS Eventim to jointly sign top acts for tours in the United

---

[4] https://www.eventimb2b.com/blog/cts-eventim-mammoth-inc-and-ag-entertainment-touring/
[5] https://www.eventimb2b.com/blog/cts-eventim-mammoth-inc-and-ag-entertainment-touring/
[6] https://corporate.eventim.de/en

States and globally. In entering this joint venture, "[a]ll three entities [would] utilize their vast resources and networks to the partnership."[7]

**B.      Rod Wave is an Internationally Renowned Soul-Trap Artist**

30.    Rod Wave is an internationally renowned singer, songwriter, and platinum certified recording artist, whose critically acclaimed albums have repeatedly topped the Billboard charts. Rod Wave is considered the pioneer of the "soul-trap" genre of music.

31.    Rod Wave's first studio album, *Ghetto Gospel*, peaked at number ten on the US Billboard 200 in 2019. His second album, *Pray 4 Love*, peaked at number two on the US Billboard 200 in 2020. Rod Wave's next three albums – *SoulFly* (2021)*, Beautiful Mind* (2022), and *Nostalgia* (2023) – topped the Billboard 200 and received platinum certifications. Rod Wave joined Taylor Swift as the only musical artist to release a new chart-topping solo album in three consecutive years. In 2024, Rod Wave released the album *Last Lap*, which debuted at number two on the Billboard 200, and making him the only male artist to release a top ten album each year from 2019 to 2024.

32.    Rod Wave's rapid ascension and popularity stem from the deep vulnerability and emotionality of his music. Writing openly about his own life

---

[7] https://www.eventimb2b.com/blog/cts-eventim-mammoth-inc-and-ag-entertainment-touring/

experiences and adversity overcome growing up in St. Petersburg, Rod Wave has been lauded by critics for his "penchant for soul-grabbing lyrics" and for his "candor and shrewd ability to tug at listeners' heartstrings."

33.     Channeling deep connections with his audiences, Rod Wave's live concerts have been described as a "healing experience between [him] and his audience," as concertgoers "can feel every word he sings."

34.     Hit House is Rod Wave's independent record label, which Rod Wave created at the age of nineteen to support his blossoming career.

### C.     Grizzly Seeks to Capitalize on Rod Wave's Success and Talent

35.     In 2022, AG Entertainment and Mammoth presented the *Beautiful Name* tour in support of Rod Wave's album of the same name.

36.     While Grizzly alleges that all production was Rod Wave's responsibility (Compl. ¶ 50), AG Entertainment provided production manager LeShun Williams ("LeShun") and his company 360 Production Group LLC (collectively with LeShun, "360 Production") for production[8] on the *Beautiful Mind* tour, as AG Entertainment frequently does on its tours.  Rod Wave thus believed that

---

[8] In the touring context, production involves the management of the logistical items underlying a concert.  This includes, among other things, coordinating with the venue, shipping equipment, "loading-in" of equipment (*i.e.*, the arrival and set-up of equipment), setting up the stage, and managing venue and touring crew.

he was required to use 360 Production as production manager for tours involving AG Entertainment and Mammoth.

37.    Consisting of 25 shows, the *Beautiful Mind* tour was immensely successful, netting AG Entertainment and Mammoth tens of millions of dollars. Seeking to further capitalize on Rod Wave's popularity, AG Entertainment and Mammoth sought to promote his next tour.

38.    On February 8, 2023, AG Entertainment and Mammoth made a "North American Tour Offer" (the "Original Tour Agreement," attached to Grizzly's Complaint as Exhibit 3). While the Original Tour Agreement named Grizzly as the "Promoter," the Agreement was written on the joint letterhead of AG Entertainment and Mammoth, and was signed on behalf of Grizzly by James Crawford (AG Entertainment's sole member) and Josh Hunt (Mammoth's Chief Executive Officer), in their capacity as Grizzly's managing members.

39.    Rod Wave had competing tour offers, including an offer worth in excess of $100 million.

40.    However, on the basis of his pre-existing relationship with AG Entertainment and Mammoth, including their representations concerning Grizzly's capability to promote a much larger 70-show tour, Rod Wave signed with Grizzly and spurned competing deals.

12

41.     Because the *Beautiful Mind* tour consisted of only 25 shows, in making his decision to continue with Grizzly as promoter, Rod Wave relied heavily on Grizzly's representations that it could successfully pull off a 70-Show tour – nearly three times larger than the *Beautiful Mind* tour.

42.     Pursuant to the Original Tour Agreement, the 70 shows ("Shows") would be separated into two segments of thirty-five (35) shows apiece, *i.e.*, the "First Leg" and the "Second Leg."  (Original Tour Agreement ¶¶ 6.)

43.     Under the Original Tour Agreement, Grizzly was required to schedule the Shows for the First Leg subject to "mutually agreeable dates" and the "[l]locations and venues [of the Shows were also] subject to mutual agreement." (Original Tour Agreement ¶¶ 5, 6.)

44.     Upon Rod Wave's mutual agreement, Grizzly would "execute[ ] all venue deals."  (Original Tour Agreement ¶ 12(g).)

45.     In the event that a Show was cancelled, Rod Wave would not be obligated to "return any advance payments made by Grizzly" if "such failure [was] the result of Grizzly's acts or omissions."  (Original Tour Agreement, Force Majeure and Cancellation.)

46.     Rod Wave has never – to his knowledge – executed any contract with 360 Production to manage production of the Shows in the First Leg and 360

Production acted under the direction of Grizzly, AG Entertainment, and/or Mammoth.

47.     Rod Wave fulfilled his obligations under the Original Tour Agreement and completed the First Leg on December 18, 2023.

**D.     Grizzly And Rod Wave Amend the Tour Agreement**

48.     Ahead of the Second Leg, both Grizzly and Rod Wave wanted to increase the size and scope of the Shows, including the use of 360-degree stages rather than the traditional 180-degree setup.  Accordingly, the parties entered into the Amended Tour Agreement (*see* Recitals ("[Hit House], [Rod Wave], and [Grizzly] wish to increase the Second Leg show capacity by implementing a round configuration with a minimum of 360 degrees.").)[9]

49.     As with the Original Tour Agreement, the Amended Tour Agreement required Grizzly to schedule Shows for the Second Leg subject to "mutually agreeable dates" and which were to be performed at "mutually agreeable venues (subject to routing)," with the "right to promote any additional mutually agreeable dates on a good faith basis."  (Amended Tour Agreement ¶¶ 5, 6.)

50.     This was a critical term, as the Amended Tour Agreement (and the Original Tour Agreement) was an "All-In" agreement.  With "All-In" agreements,

---

[9] Accordingly, Grizzly is disingenuous when it pleads that *only* Rod Wave desired to increase the size and scope of the Shows.  (Compl. ¶¶ 8, 23.)

promoters front the performing artist a set amount to cover items such as "travel, lodging, hospitality, show catering, production, cancellation insurance, support, and support production/backline."  (*See* Amended Tour Agreement ¶ 7(a).)  "All-in" agreements incentivize the artist to ensure an efficient production, as the performing artist keeps all amounts not spent on the tour's production and expenses.

51.    Critically, "All-In" agreements *demand* certainty, economies of scale, and can only function with a firmly set and predictable touring schedule and routing plan.  A promoter's duties involve scheduling an artist to perform on particular dates at certain venues.   These scheduling choices must be guided by routing considerations, including planning a series of live performances in a way that minimizes the traveling burdens of the artist, crew, and equipment *i.e.*, back-to-back shows in cities in Ohio as opposed to shows in Ohio and Texas.  Routing decisions which require long and/or repetitive travel only serve to increase costs and burdens on the artist and crew.

52.    Where a promoter does not optimize the scheduling and routing, the performing artist cannot precisely allocate resources towards expenses.   These expenses will rise when the promoter reschedules shows.  Every day that an artist spends on the road costs additional money and frustrates the purpose of the deal.

53.    Pursuant to the Amended Tour Agreement, Grizzly guaranteed $40,250,000 to Rod Wave for the Second Leg, to be earned by Rod Wave at a rate

15

of $1,150,000 per show (the "Commitment").  (Amended Tour Agreement ¶ 7.) Grizzly agreed to pay an advance on the Commitment totaling no more than $20,125,000 (the "Advance") upon execution of the Amended Tour Agreement, with the remaining balance of the Commitment to be paid "pro-rata on a weekly basis." (*Id.* ¶¶ 7, 8.)

54.     In exchange for the Commitment, Grizzly would receive 100% of ticket sales.  (Amended Tour Agreement ¶¶ 7,8.)   In connection with the Advance, Rod Wave executed the Artist Guaranty in which he agreed to return only "unearned portions" of the Advance.   In other words, the Advance which Rod Wave was obligated to return, if unearned, extended only to the $20,125,000 advanced to Rod Wave pursuant to the Amended Tour Agreement.  (Amended Tour Agreement, §8(a); Artist Guaranty ¶ 1.)

55.     The Amended Tour Agreement contained an exclusivity provision which provided that Grizzly "will have Right of First Refusal on all show dates in North America," but only "*while this agreement is in effect*."   (Amended Tour Agreement ¶ 10 (emphasis added).)

56.     Additionally, unless "expressly amended," "all other terms contained in the [Original Tour] Agreement . . . shall remain unmodified and in full force and effect." (Amended Tour Agreement ¶ 15.)  The parties did not amend the provision in the Original Tour Agreement concerning Force Majeure and Cancellation, which

provides that, in the event that a Show was cancelled, Rod Wave would not be obligated to "return any advance payments made by [Grizzly]" if "such failure [was] the result of [Grizzly's] acts or omissions." (Original Tour Agreement, Force Majeure and Cancellation.)

57.    In connection with the Advance, Grizzly, in turn, was required to "acquire[ ] non-appearance insurance." (Amended Tour Agreement ¶ 8(a).)

58.    On March 6, 2024, Grizzly paid the Advance. However, Grizzly did not pay all of the money it owed to Rod Wave under the Amended Tour Agreement. Instead, $1,000,000.00 was deducted as "Cash to Rod/ Beau" and $812,651.00 was deducted as "Owed to Beau." ("Advance Invoice," attached hereto as **Exhibit A**.) Presumably, the first deduction was paid entirely to Beau Williams ("Williams") – Rod Wave's former agent – as the last line indicates payment for what was "[o]wed to Rod Wave after deductions." (*Id.*) Upon information and belief, Rod Wave did not know about – or authorize – the deducted payments given to Williams by Grizzly.

59.    Altogether, Grizzly paid Williams upwards of $1,812,651.00 in the days surrounding the execution of the Amended Tour Agreement. Upon information and belief, AG Entertainment made further payments to Williams not reflected on the Advance Invoice.

17

**E.** **AG Entertainment Underhandedly Attempts to Seek the Right to Rod Wave's Next *Five* Tours**

60.     Following weeks of negotiations for the Amended Tour Agreement, Williams – after ostensibly being bribed by AG Entertainment – presented Rod Wave with a copy of the Amended Tour Agreement for execution at an in-person meeting. The Agreement, however, contained previously undisclosed extra pages containing a never-discussed "Right of First Refusal" (the "Refusal Agreement," attached hereto as **Exhibit B**).

61.     Under the Refusal Agreement, AG Entertainment and Williams' company, "Beau Williams Entertainment, LLC," described as "international concert promotions companies" and jointly defined as the "Promoter" (Refusal Agreement, Recitals), would be granted the "right of first refusal . . . to promote [Rod Wave's] next five (5) North American and/or International Concert Tours." (Refusal Agreement ¶ 1.)

62.     The Refusal Agreement did not propose any consideration for Rod Wave's grant of exclusivity. (*See generally* Refusal Agreement.) Moreover, AG Entertainment and Williams presented the Refusal Agreement to Rod Wave in an underhanded manner at the time of the execution of the Amended Tour Agreement with the hope that Rod Wave would not notice the new provisions and sign it. Indeed, Williams subsequently admitted to Rod Wave's lawyer that he hoped Rod Wave would not think it was "shady." Fortunately, Rod Wave refused to sign.

18

**F.   360 Production Contracts On Behalf of a
       Fictitious Rod Wave Entity**

63.    While Grizzly contends that production for the Second Leg was Rod Wave's responsibility (Compl. ¶¶ 8, 50), Grizzly yet again provided 360 Productions to run production for the Second Leg.  360 Production – not Rod Wave – entered into a production agreement with Production Resource Group, L.L.C. ("PRG") (the "PRG Agreement," attached as Exhibit 6 to the Complaint).

64.    What is more, 360 Production's LeShun Williams purported to sign that agreement on behalf of "Rod Wave Inc.," an entity which Rod Wave did not approve or create and which, upon information and belief, does not exist.

65.    Moreover, Rod Wave never knowingly executed any contract with 360 Production in connection with the Shows in the Second Leg or otherwise gave authority to 360 Productions to bind Rod Wave to any agreement.

66.    Rather than Rod Wave's direction, 360 Production was acting pursuant to Grizzly's direction.

67.    Moreover, Rod Wave never communicated with PRG.  As demonstrated in PRG's quote for the Second Leg ("PRG Quote," attached hereto as **Exhibit C**), PRG understood that their client was 360 Production, not Rod Wave.  Indeed, throughout the PRG Quote, the "Client" is listed as 360 Production and LeShun Williams.

19

### G.   Grizzly Breaches its Obligations Under the Amended Tour Agreement

68.     Under the Amended Tour Agreement, Grizzly was required to promote Shows on "mutually agreeable dates" and "at mutually agreeable venues (subject to routing)," (Amended Tour Agreement ¶¶ 5, 6). Grizzly breached these obligations, including by making unilateral, onerous and inexplicable routing and booking decisions rendering it logistically impossible for Rod Wave to complete the Second Leg.

69.     The thirty-five show Second Leg was announced on September 4, 2024. Pursuant to the Second Leg schedule, the tour was originally scheduled to begin on October 19, 2024 and conclude on December 18, 2024.  Attached hereto as **Exhibit D** is the original Second Leg announcement.

70.     Tickets to the Second Leg went on sale on September 6, 2024.  By October 16, 2024 (three days before the tour commenced), 253,398 tickets had been sold, netting gross ticket sales of $32,509,736.13.

71.     On October 19, 2024, following the first Show, it became clear that there were issues with production management under 360 Production as Grizzly's provided production manager proved incapable of loading-out the equipment from the venue in time to be loaded-in at the next venue for the show scheduled for the following night.

72.     As a result of 360 Production's failures with respect to the first Show, and, despite the sale of hundreds of thousands of tickets netting tens of millions in dollars, Grizzly began proposing new touring schedules (attached hereto as **Exhibits E, F, G, H, I, J and K**).

73.     However, Grizzly's proposals were erratic, sometimes varying on an hourly basis.  For example, following a proposal on October 22, 2024 at 17:51 PM (Ex. E), Grizzly made a second proposal only hours later at 21:58 PM (Ex. F) which contained no fewer than fourteen (14) *new* date/venue combinations while removing seventeen (17) date/venue combinations from the previous proposal provided mere hours before.

74.     At the same time, Grizzly unilaterally determined to extend the conclusion of the Second Leg past the original conclusion date of December 18, 2024 into at least *February 2025*.  This meant that Rod Wave would be required to stay on tour longer – foregoing other potential opportunities during that time, including further promotion of his *Last Lap* album and potential film projects which were presented to him during the tour.   It also meant increased production costs.

75.     Grizzly's erratic rescheduling and rerouting efforts continued for the remainder of the Second Leg.  Rod Wave frequently learned only at the last minute that a Show had been rescheduled, often only after seeing tickets for these

rescheduled shows available online.   Only twelve (12) of the thirty-five (35) scheduled Second Leg Shows occurred at the date and venue originally announced.

76.    Grizzly's unilateral – and often last-minute – alterations, violated Grizzly's requirement to book Second Leg Shows on "*mutually agreeable* dates" at "*mutually agreeable* venues (subject to routing)," and fell outside the scope of Grizzly's "right to promote any additional *mutually agreeable* dates on a *good faith basis*" (Amended Tour Agreement ¶¶ 5-6 (emphasis added).)

77.    In an effort to avoid *further* disappointment to his fans and stave off harm to his image and brand, Rod Wave continued to perform at these rescheduled Shows, despite the twin hardships of erratic and last-minute routing changes and 360 Production's incompetence.   Indeed, despite his growing concerns with the quality of the Second Leg, Rod Wave performed 28 Shows (*not* 26 as Grizzly erroneously alleges (Compl. ¶ 73)).

78.    As a result of Grizzly's last-minute rescheduling, it became impossible for Defendants to adequately plan for required services and expenditures for the remaining Second Leg shows.   Rod Wave informed Grizzly that, given Grizzly's last-minute, erratic changes to the tour schedule (which were in breach of the Amended Tour Agreement), it was infeasible for Rod Wave to continue covering the costs of the tour.   In response, Grizzly agreed to cover the remaining costs of

production.  Such payments were not to be treated as "advances" under the Original Tour Agreement, Amended Tour Agreement or Artist Guaranty.

79.    However, even with Grizzly agreeing to cover additional production costs, the quality of production management deteriorated as the (erratically) rescheduled Shows wore on.  360 Production—which again, was provided by Grizzly—failed to properly ship and load-in Defendants' touring equipment and staging to the Shows, even when the production equipment and staging arrived on time, which it often did not.  These failures made it impossible for Rod Wave to continue performing Shows at the highest-level quality that his fans deserve, and which Rod Wave expects from himself.

80.    Frustrated and disheartened by Grizzly's failures, Rod Wave determined that he could not continue with the remaining seven Shows given the incompetence of Grizzly, his touring promoter, and Grizzly's production manager, 360 Production.

81.    While Grizzly was responsible for the cancellations, it was Rod Wave's reputation that suffered.  The cancellations "sparked outrage"[10] with disappointed fans "tak[ing] to social media to express their frustrations," including that Rod Wave:

---

[10] https://ticketx.com/magazine/music/how-to-get-cheap-rod-wave-tickets-today

"gotta do better,"[11] that Rod Wave had "played" them and was "unreliable."[12] When Rod Wave attempted to take a vacation shortly thereafter, fans "lit up" Rod Wave and "called [him] out [ ] for prioritizing relaxation over his music career."[13]

82.    Meanwhile, as of January 24, 2025, shortly before the cancellation of the remaining Shows, the rescheduled Second Leg had grossed Grizzly $60,423,740.27.

### H.    Rod Wave Is Not Required To Return Any Funds Pursuant to the Artist Guaranty or Either of the Tour Agreements

83.    On or about July 22, 2025, Grizzly sent Rod Wave a "Demand for Repayment of Unrecouped Advances" (the "Grizzly Demand Letter," attached hereto as **Exhibit L**).

84.    In the Grizzly Demand Letter, Grizzly asserted that Rod Wave must return "unearned Advances in the amount of $27,081,774.86." (Grizzly Demand Letter at 1.)

85.    Through the Complaint, Grizzly alleges that it advanced sums over and above the $20,125,000 to Rod Wave, and that the Artist Guaranty requires Rod Wave to return those sums, which are allegedly unearned. (Compl. ¶ 47.)

---

[11] https://www.yahoo.com/entertainment/rod-wave-cancels-nashville-concert-001549806.html
[12] https://ticketx.com/magazine/music/how-to-get-cheap-rod-wave-tickets-today
[13] https://www.hotnewhiphop.com/887569-rod-wave-gets-lit-up-fans-vacationing-after-canceled-tour-hip-hop-news

86.     Grizzly is incorrect. Grizzly itself pleads that Rod Wave earned at least $29,900,000 in guarantees under the Amended Tour Agreement.  (Compl. ¶ 45.) Because Rod Wave earned an amount in excess of the $20,125,000 covered by the Artist Guaranty, the Artist Guaranty does not require Rod Wave to return any other funds to Grizzly.

87.     Moreover, while Grizzly contends that it "advanced" more than $27 million to Rod Wave over and above the $29,900,000 that Rod Wave concededly earned under the Amended Tour Agreement (*id.*), Grizzly does not provide a scintilla of factual support for those figures, much less allege that they were made in connection with any agreement.  Indeed, according to Grizzly, Grizzly simply advanced an additional $27 million to Rod Wave "at Artist's request" without any additional documentation or agreement.  Grizzly does not even allege when or to whom these alleged payments were made.

88.     While Grizzly alleges (again, incorrectly), that the Artist Guaranty requires Rod Wave to return alleged advances in excess of the $20,125,000 Advance set forth in the Amended Tour Agreement, Rod Wave's alleged waiver of claims and rights against Grizzly under the Artist Guaranty applied only "[s]o long as [Grizzly] is not in breach of the [Amended] Tour Agreement."  (Artist Guaranty ¶ 6.)  As set forth above, Grizzly indeed breached the Amended Tour Agreement.

## I.    Grizzly Cannot Enforce Any Exclusivity Provision in the Amended Tour Agreement

89.    In the Grizzly Demand Letter (at 1), Grizzly also asserted that the "term of the Tour Agreement is still in effect" and that Rod Wave is "still bound by the Exclusivity Terms of the Tour Agreement pending resolution."

90.    On September 18, 2025, counsel for Rod Wave responded to the Grizzly Demand Letter and informed Grizzly – as set forth above – that it was in breach of the Amended Tour Agreement as a result of its unilateral, onerous and inexplicable routing and booking decisions, as well as Grizzly's negligent management of its provided production manager to ensure competent shipment and load-in of Rod Wave's touring equipment and staging ("Response Letter," attached to the Complaint as Exhibit 5, at 2).

91.    As a result of these breaches, Rod Wave informed Grizzly that the Amended Tour Agreement and any exclusivity provisions therein were no longer in effect.  (Response Letter at 2.)

92.    Rather than engage in the dialogue that Grizzly itself began, Grizzly filed the Complaint in this action on September 29, 2025, subjecting Rod Wave to intense media inquiry and criticism with its baseless claims.

93.    While Grizzly alleges that Rod Wave's "representatives approved all of the Show dates, as well as the routing and booking decisions, well in advance of the *originally scheduled* Shows" (Compl. ¶ 62 (emphasis added)), Grizzly critically

26

omits any allegation that it sought Rod Wave's mutual agreement before finalizing its unilateral, onerous and inexpiable re-routing and booking decisions during the rescheduling of the Second Leg, more than eight months after the execution of the Amended Tour Agreement and after the Second Leg had already commenced.

94.    Moreover, Grizzly asserts that 360 Production was "responsible for shipping and loading equipment before and after each Show," not Grizzly. (Compl. ¶¶ 65, 68.)  However, it was *Grizzly* who provided and oversaw 360 Production. Upon information and belief, Defendants never executed any agreement with 360 Production.

95.    And while Grizzly alleges that the PRG Agreement was signed by "Rod Wave Inc" (Compl. ¶¶ 65-66), in fact it was signed by Grizzly's provided production manager LeShun Williams on behalf of Rod Wave Inc., an entity that does not exist. Moreover, Williams acted without Rod Wave's authority in signing the PRG Agreement.

## COUNT I
### (Breach of the Amended Tour Agreement)

96.    Defendants reincorporate and reallege by reference all allegations in all preceding paragraphs, as if fully set forth herein.

97.    The Amended Tour Agreement was a valid and binding contract.

98.    The Amended Tour Agreement required Grizzly to schedule, promote, and/or book Shows for the Second Leg on "mutually agreeable dates," which would

27

be performed at "mutually agreeable venues (subject to routing)," with the "right to promote any additional mutually agreeable dates on a good faith basis." (Amended Tour Agreement ¶¶ 5, 6.)

99.    In return, Defendants furnished Rod Wave's services to Grizzly for a seventy-show tour, including the thirty-five-show Second Leg. (Amended Tour Agreement, Recitals.)

100.    In contravention of its contractual obligations, Grizzly unilaterally altered the schedule and re-routed the Shows, often on a last-minute basis. These unilateral alterations go to the essence of the contract.

101.    Accordingly, Grizzly materially breached the Amended Tour Agreement.

102.    As a result of Grizzly's breaches and the numerous cancelled shows stemming therefrom, Defendants have sustained substantial damages, including reputational damages, in amount to be proved at trial.

103.    At all relevant times, Defendants performed or stood ready to perform their allegations under the Tour Agreement, the Amended Tour Agreement and the Artist Guaranty.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (Pleaded in the Alternative to Count I)

104.    Defendants reincorporate and reallege by reference all allegations in all preceding paragraphs, as if fully set forth herein.

105.    Florida law recognizes an implied covenant of good faith and fair dealing in every contract, which is intended to protect the reasonable expectations of the contracting parties in light of their express agreement.  To this end, the implied covenant prevents any conscious and/or deliberate act by one party which frustrates the purpose of the agreement and deprives the other party of any benefits under the agreement.

106.    Pursuant to the Amended Tour Agreement, Grizzly was required to promote Shows for Rod Wave on "mutually agreeable dates" and "at mutually agreeable venues (subject to routing)."  (Amended Tour Agreement ¶¶ 5, 6.)

107.    After the Shows were announced to the public, Grizzly engaged in erratic and fluctuating attempts at rescheduling and rerouting Shows, which resulted in (i) only twelve (12) of the original thirty-five (35) Shows being performed as planned, (ii) the prolongment of the tour by several months, (iii) last-minute announcements as to forthcoming Shows, and (iv) the inability and/or impossibility of Rod Wave performing the remaining seven Shows in the Second Leg.

108.    Through its onerous and inexplicable rescheduling and rerouting of Shows, Grizzly failed to abide by the good faith spirit of its obligations and fell short of commercially reasonable efforts and Rod Wave's basic and fundamental expectations under the Amended Tour Agreement.

109.    As a result of Grizzly's failure to fulfill its obligations in good faith, numerous Shows were cancelled, inconveniently scheduled and/or improperly routed, resulting in substantial damages to Defendants, including reputational damages, in amounts to be proved at trial.

## <u>COUNT III</u>
## <u>(Declaratory Judgment: Amended Tour Agreement)</u>

110.    Defendants reincorporate and reallege by reference all allegations in all preceding paragraphs, as if fully set forth herein.

111.    Grizzly asserts that the Amended Tour Agreement is still in effect and that Rod Wave is still bound by the exclusivity provisions therein.  (Compl. ¶¶ 93, 101-102, 106, 110-111; Grizzly Demand Letter at 1.)

112.    Defendants maintain that, because of Grizzly's breaches, the Amended Tour Agreement is no longer in effect and Rod Wave is no longer bound by any exclusivity provision therein.

113.    Based on the foregoing, there is an actual justiciable controversy between the parties.

30

114.    In its Complaint, Grizzly seeks preliminary and permanent injunctive relief that would prevent Rod Wave from "performing and touring without Grizzly" on the grounds that Rod Wave is bound by the exclusivity provisions therein.

115.    However, enforcement of the exclusivity provisions in these circumstances would require specific performance of a personal services contract that would force Rod Wave and Grizzly together in the continued performance of personal services, causing substantial and irreparable injury to Defendants, including reputational injury.  Defendants have lost confidence in the ability of Grizzly to provide competent touring and promotion services.

116.    The declaratory judgment requested in Count III would resolve this justiciable controversy.

117.    Defendants have no other adequate remedy at law.

## COUNT IV
## (Declaratory Judgment: The Original Tour Agreement, Amended Tour Agreement and Guaranty)

118.    Defendants reincorporate and reallege by reference all allegations in all preceding paragraphs, as if fully set forth herein.

119.    Grizzly asserts that Defendants owe it $27,243,146.86 under the Amended Tour Agreement and under the Artist Guaranty.  (Compl. ¶¶ 48; 81-84.)

120.   Defendants maintain that Grizzly's requested relief is not recoverable under the Original Tour Agreement, Amended Tour Agreement or the Artist Guaranty.

121.   The Artist Guaranty only extends to obligations under the Amended Tour Agreement, in particular, Grizzly's obligation to advance $20,125,000 to Rod Wave.  (Compl. ¶¶ 27, 30; Amended Tour Agreement § 8(a).)

122.   The relief requested by Grizzly seeks amounts that Grizzly agreed to pay separate and apart from the Amended Tour Agreement and the Artist Guaranty.

123.   Grizzly has not alleged the existence of any agreement with Defendants concerning amounts provided by Grizzly in excess of the $20,125,000 advance referenced in the Amended Tour Agreement.

124.   Based on the foregoing, there is an actual justiciable controversy between the parties.

125.   Through the Complaint, Grizzly has sought to recover $27,243,146.86 under the Amended Tour Agreement and Artist Guaranty, to which Defendants contend it is not entitled under either agreement.

126.   The declaratory judgment requested in Count IV would resolve this justiciable controversy.

127.   Defendants have no other adequate remedy at law.

A jury trial is demanded on all claims so triable.

32

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants demand judgment against Grizzly, and pray for relief as follows:

I.     Judgment against Grizzly for breach of the Amended Tour Agreement and for the implied covenant of good faith and fair dealing; in an amount to be determined at trial, plus interest;

II.    A judicial declaration that the Amended Tour Agreement and the exclusivity provisions therein are of no further force or effect and that Defendants cannot be compelled to perform additional Shows with Grizzly as promoter, including because of personal service contract principles;

III.   A judicial declaration that Defendants do not owe Grizzly any monies under the Amended Tour Agreement, the Artist Guaranty or otherwise; and

IV.    Such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ James G. Sammataro
James G. Sammataro (FBN 520292)
* Lead Counsel *
Brendan S. Everman (FBN 68702)
jsammataro@pryorcashman.com
ksuarez@pryorcashman.com
**PRYOR CASHMAN LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: (786) 582-3010
Facsimile: (786) 582-3004

David C. Rose*
Matthew S. Barkan*
Kevin R. Savarese*
drose@pryorcashman.com
mbarkan@pryorcashman.com
ksavarese@pryorcashman.com
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
*pro hac vice motions forthcoming*

*Counsel for Defendants Rodarius Marcell Green and Hit House Entertainment, Inc.*

34